Henderson W. Morrison, J.
The defendant, by his attor *635 ney, applies to this court for an order dismissing the indictment which accuses him of bribe receiving in the second degree and official misconduct (two counts) on the ground that the evidence before the Grand Jury was not legally sufficient to establish the offenses charged nor any lesser included offenses (CPL 210.30) and on the ground that the indictment is defective within the meaning of CPL 210.25.
The court has examined the minutes of the Grand Jury proceeding which resulted in the indictment and upon that inspection finds that the evidence before the Grand Jury was not legally sufficient to establish the offenses charged nor any lesser offenses. (CPL 210.30; CPL 70.10, subd 1).
The evidence before the Grand Jury reflects that at the time in question the defendant was a Suffolk County legislator. John V. N. Klein who was then the Presiding Officer of the Suffolk County Legislature appointed the defendant chairman of a special temporary committee to study the feasibility of offtrack betting or a county race track for Suffolk County. The committee consisted of twelve members including the defendant. By letter dated July 12, 1971 Mr. Klein informed the committee that, "The responsibility of your committee will be to review this entire subject (off-track betting and race tracks) to determine which * * * possibilities will be in the best interest of the people of Suffolk County and to make a recommendation in that connection to the County Legislature through me, as Presiding Officer.”
Louis Wilson was an employee of Analytics, a corporation engaged in the business of computer related services, and was also the president of National Totalisator, Inc., a firm which designed gaming systems for race tracks and lotteries. Mr. Wilson was introduced to the defendant and subsequently made a formal presentation to the entire committee with regard to the services supplied by Analytics and Totalisator. A few weeks later Mr. Wilson had a private meeting with the defendant at which a Mr. Grande was present. Mr. Wilson recounted what occurred as follows:
"A. Well, Mr. Adams told me he had been impressed by my presentation and by the capability we had in this general area of gaming systems and that he had a problem, that he had been with this committee, holding hearings for quite a number of weeks, had accumulated a tremendous volume of paper. These were proposals that had been submitted to the committee and stenographic notes of transcripts of the actual meet *636 ings that he had arrived at some conclusions as to what he felt the committee’s recommendation should be but that he needed help, a ghost writer essentially to take his conclusions and all his mound of paper and put it together into a coherent report that would make the recommendation he wanted to make.
"Q. Did he ask you to do that report?
"A. He asked me if this was a job I could do and if I would be interested in undertaking it.
"Q. And what did he say he would do for you, if anything, in return for your doing this report?
"A. Well, he indicated that the committee had no money to pay me for my services at this point but that if we were to do this job for him and did a good job that he expected that the committee would continue to have life for a while thereafter and would probably have funds to do some further investigating and would probably need consulting help in looking into the area of our expertise and he would see what he could do about getting further work for us.
"Q. Would it be fair to say he stated that he would exert his effort to get you further consultation fees?
"A. Yes, that was made quite clear.
"Q. That was made quite clear by Mr. Adams as a quid pro quo for your doing the report?
"A. Yes, sir.
"Q. Now, did he, although he gave you the job of ghost writing this report and gave you a mound of papers through which to glean and use or not to use as you saw fit to make the report. Did he insist that certain conclusions be in your report?
"A. Definitely.”
Mr. Wilson then proceeded to prepare a report which was submitted to the defendant. An almost verbatim duplicate of this report was adopted by the special legislative committee and presented to Mr. Klein.
Subsequently, after Suffolk Meadows had come into existence, the two firms with which Mr. Wilson was involved received contracts. National Totalisator acted as both a consultant and a prospective supplier. Suffolk Meadows issued a letter of intent to purchase pari-mutuel equipment from National Totalisator. In its consulting capacity, however, National Totalisator recommended the purchasing of pari-mutuel *637 equipment from another company. The bottom line on its dealings with Suffolk Meadows was a fee contingent upon the eventual and successful operation of the race track.
Analytics was retained to provide computerized scheduling for construction of the track and also for on site construction management. A fee of $121,000 was agreed upon for these services.
Section 200.10 of the Penal Law provides: "A public servant is guilty of bribe receiving in the second degree when he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that his vote, opinion, judgment, action, decision or exercise of discretion as a public servant will thereby be influenced.” The defendant argues that his conduct did not violate this provision because (1) he derived no "benefit”; (2) there was no corrupt agreement; and (3) no official duty was involved. Proceeding in reverse order, the court is satisfied that the conduct here alleged involved an official duty. The official duties of a legislator include the conduct of and participation in legislative investigations; discussion, persuasion and the influencing of other legislators; and the exercise of a power or authority derived from an actual relationship between a legislator as legislator and a particular matter. (People v Ginsberg, 80 Misc 2d 921, 927.) The conduct here in question fits easily within the boundaries of a legislator’s official duties.
"The gist of the crime of bribery is the wrong done to the people by corruption in the public service.” (People v Lafaro, 250 NY 336, 342; People v Chapman, 13 NY2d 97, 101.) Thus, the public servant who agrees to and does manipulate events, not to benefit himself or a third party, but for the personal satisfaction of commanding obedience, is said to receive no bribe. (See Commonwealth v Albert, 310 Mass 811, 819, citing People v Hyde, 156 App Div 618.) Nor is every agreement or understanding that a legislator’s action as a public servant will be influenced by a benefit to himself or a third party considered "corruption in the public service.”
"The necessary breadth of the definition of 'benefit’ does, however, create difficulties when applied to bargains made in the process of political compromise * * * |T|t would be unrealistic and improper to make all such compromises criminal, even though they may involve offers of appointment or promotion in the public service, or promises to vote for a particular measure given in exchange for a like 'benefit’ proffered by *638 another.” (Model Penal Code, Tentative Draft No. 8, Comments to § 208.10.) The evidence before the Grand Jury reveals too nebulous a benefit, too little credit redounding to the defendant among others by reason of his supposed authorship and an agreement which, if it existed at all, was far too contingent and uncertain to support an indictment for bribe receiving.
There is no evidence that the report, which is all that the defendant is alleged to have received, benefited him in any direct material way. The more abstract concept of a "political advantage” may suffice in a bribe receiving prosecution (People ex. rel Dickinson v Van De Carr, 87 App Div 386). Here, however, the political advantage is negligible. Only the most politically naive would believe that reports such as that before this court have a measurable effect upon the author’s electoral prospects. Not for many years has the public really believed that officials write their own speeches or reports. Certainly, the defendant was under no legal obligation to write a report himself nor would his failure to do so incur a sanction.
The Presiding Officer of the Legislature had requested that the committee make recommendations. This obligation, if it may be called that, was arguably satisfied by the dictation of conclusions by the defendant to Mr. Wilson. The value of presenting a report to the committee for its consideration is limited. Once adopted by the committee as its report, the defendant became only one of twelve beneficiaries. Indeed, assuming that the recommendations were meritorious, a matter not here at issue, the county too was a beneficiary having received an organized summary of the committee’s work.
The agreement or understanding between the defendant and Mr. Wilson, based upon the evidence before the Grand Jury, is far too imprecise to support an indictment for bribe receiving. The defendant made no unconditional promise of future reward without regard to merit. He agreed to compromise no principle of good government in return for the report. He merely stated that if Mr. Wilson rendered a voluntary service, he would possibly be favorably regarded in the future. Consultants such as Mr. Wilson might well consider it a worthwhile investment to furnish valuable services voluntarily and at no cost in order to develop rapport and communications with an eye toward contingent future benefits. The circumstances of this case as reflected in the Grand Jury evidence provide no basis for characterizing the understanding between the defendant and Mr. Wilson as corrupt.
*639 The first count of the indictment is dismissed on the ground that the evidence before the Grand Jury was not legally sufficient. For the same reasons, and for the reason that the second and third counts do not adequately comply with the requirements of CPL 200.50 (subd 7), the second count which accuses the defendant of receiving a reward for official misconduct and the third count which accuses him of official misconduct are dismissed.